# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TRAVIS DELANEY WILLIAMS,

    Plaintiff,

  v.                                                                                                                        Case No. 14-C-452

NURSE LESLIE,
NURSE TOM,
NURSE PRACTITIONER JANE DOE,
PATRICK NOONAN,
LT. FRIEND,
SGT. MELISSA A. GONZALES,
CAPTAIN WEARING,
DEREK BERGUM,
NURSE NICOLE,
TROOPER JOHN DOE, and
CARRIE L. BALLEW,

    Defendants.

## DECISION AND ORDER

Plaintiff Travis Delaney Williams filed a *pro se* complaint under 42 U.S.C. § 1983, alleging that his civil rights were violated. He claims that certain Wisconsin State Patrol troopers as well as correctional and medical staff at the Racine County Jail violated his constitutional rights through their deliberate indifference to his serious medical needs. This matter, recently reassigned to the undersigned judge, is now before the court on the defendants' motions for summary judgment. ECF Nos. 82, 88, 92. For the following reasons, the defendants' motions will be granted and the case dismissed.

# PRELIMINARY MATTERS

Before turning to the parties' substantive arguments, the court will first address two preliminary matters. First, Williams filed what appears to be a fourth motion to appoint counsel, days after this case was reassigned to this court. Civil litigants do not have a constitutional or statutory right to appointed counsel. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007) (en banc); *Zarnes v. Rhodes*, 64 F.3d 285, 288 (7th Cir. 1995). Yet, district courts have discretion to recruit attorneys to represent indigent parties in appropriate cases pursuant to 28 U.S.C. § 1915(e)(1). The court must address the following question: given the difficulty of the case, does the plaintiff appear competent to litigate it himself? *Pruitt*, 503 F.3d at 654–55 (citing *Farmer v. Haas*, 990 F.2d 319, 321–22 (7th Cir. 1993)). Under the *Pruitt* standard, Williams has failed to demonstrate a need for court-recruited counsel at this time.

Williams maintains counsel is warranted because Judge Pepper directed him to review the summary judgment motion with psychological services staff. Due to the limited availability of staff members, however, he did not have the opportunity to do so. Williams also asserts that he did not have glasses until after June 22, 2017, and that he was not given his psychiatric medications. Instead, he was forced to submit a response to the defendants' motions while under many mind-altering illnesses and untreated, chronic, crippling pain. He claims these circumstances warrant court-recruited counsel and require the court to reopen briefing on the defendants' motions for summary judgment. The court notes that Judge Pepper never required Williams to confer with staff before submitting his response to the defendants' motions for summary judgment. Rather, she agreed in her February 13, 2017 order that Williams' attempts to do so and the delay in getting staff to help him warranted an extension of time to respond to the medical defendants' motion for

summary judgment. ECF No. 120. Even without staff assistance, Williams was able to amply and extensively respond to all three motions for summary judgment. Judge Pepper found in her July 13, 2017 order that the motions for summary judgment were fully briefed and ready for decision. ECF No. 160.

Williams accepted that the motions were fully briefed for over five months, until he thought he might be able to convince the court to reopen briefing. I will not do so. Williams has revealed an ability to litigate on his own behalf. His filings are neat and his arguments are clear. There is nothing in the record to suggest that Williams does not have the same competence to represent himself as the vast number of other *pro se* litigants who cannot afford to hire an attorney and are unable to convince one to take his case on a contingent fee basis. I conclude that the difficulty of this case—both factually and legally—did not exceed Williams' capacity to represent himself and file briefs in opposition to the defendants' motions for summary judgment. Accordingly, Williams' motion to appoint counsel will be denied.

Second, Williams listed several defendants who were identified by their partial names or named as John Does. In a scheduling order entered April 19, 2016, Judge Pamela Pepper, the assigned judge at the time, advised Williams that he had until June 22, 2016 to identify the proper defendants and file an amended complaint naming them. To date, Williams never properly identified Nurse Tom, Nurse Practitioner Jane Doe, or Trooper John Doe. Because he has not identified these defendants in a timely manner, his claims against them will be dismissed with prejudice. Even if Williams had named these defendants, he has not demonstrated a violation of his constitutional rights by either named or unnamed defendants.

# BACKGROUND

Williams' claims begin with his arrest on May 8, 2013, and include the medical treatment he received following his arrest, at the incident site, at the hospital, and at the Racine County Jail, as well as medical care he received during his time at the Jail in 2013 and 2014.[1]

**A. Pursuit and Arrest**

On May 8, 2013, Williams led law enforcement officials on a high speed chase through Kenosha and Racine Counties. Defendant Derek Bergum, a state trooper employed by Wisconsin State Patrol and the Department of Transportation, was on duty, operating a fully-marked Wisconsin State Patrol cruiser and in full uniform, during the time of the pursuit. Bergum heard about the pursuit on his radio and observed Williams' vehicle headed toward his location on Highway 142, just west of I-94 southbound. He activated his emergency lights and joined the Kenosha County Sheriff's deputy already following Williams. Bergum subsequently became the primary officer pursuing Williams after Kenosha County terminated its pursuit. During the pursuit, Williams traveled at speeds over 100 miles per hour, drove recklessly, and endangered the safety of others. He showed disregard for human life by passing into oncoming traffic, operating left of center, cutting in front of other vehicles after passing, and going through intersections controlled by stop signs. ECF No. 90, ¶¶ 2–8. Ignoring his own blatant and unlawful refusal to comply with the various officers' commands that he pull over and stop his vehicle, Williams suggests that he was forced to engage in this erratic driving due to a renegade, rogue Wisconsin state trooper's actions, though he does not deny the characterization of his driving. ECF No. 127, ¶ 8.

---

[1] The facts are taken from the defendants' proposed findings, Williams' responses, the defendants' replies, Williams' proposed findings of fact, and the defendants' responses, as well as sworn declarations from Williams and the defendants. Disputes of fact will be noted.

A state trooper set tire deflation devices at a roundabout Williams was quickly approaching. Williams maneuvered around the deflation devices and continued south onto Highway 45. Bergum contacted dispatch and requested authorization to use the Pursuit Intervention Technique to end the pursuit. Sergeant Rembert approved and authorized the request. A Racine County Sheriff's Deputy, traveling northbound in the southbound lane on Highway 45, forced Williams to slow down and veer around his vehicle. This gave Bergum the opportunity to perform the Pursuit Intervention Technique, bringing Williams to a stop and ending the pursuit. Williams maintains that his car had run out of gas and was coasting when Bergum ran into the side of the car. *Id.*, ¶¶ 9–12.

Once Williams' vehicle stopped, Bergum exited his car and ordered Williams to exit his vehicle. Bergum and several other law enforcement officers ultimately helped Williams exit the vehicle through his passenger side window. Bergum secured Williams' feet while the other officers handcuffed him and then placed him in Bergum's cruiser and under arrest. When another trooper informed Bergum that Williams complained of neck, back, and leg pain, Bergum contacted dispatch and requested an ambulance. After Williams' arrest, Bergum relinquished his custody to the Racine County Sheriff's Department. An ambulance transported Williams and a Racine County deputy to Wheaton Franciscan All Saints Hospital in Racine. Bergum did not accompany Williams in the ambulance. Instead, he remained at the scene to conduct a search of Williams' vehicle. *Id.*, ¶¶ 13–23.

**B. Hospital**

Bergum arrived at the hospital after searching Williams' vehicle and made contact with the deputies stationed with Williams. The deputies advised Bergum that medical personnel were

evaluating Williams. Two Racine County deputies remained at the hospital with Williams and transported him to the Racine County Jail after he received medical clearance.

Williams' May 8, 2013 hospital chart notes injury to the posterior neck and C-spine, left shoulder, upper back and thoracic spine, right shin, and left shin. ECF No. 103, Ex. 1. The assessment noted that Williams was comfortable, was able to walk with no acute distress, and was able to move all extremities with adequate strength. *Id.* The emergency department medical doctor reviewed and approved the discharge instructions, diagnosis, and management plan. ECF No. 103, Ex. 2. These discharge instructions indicated that Williams had been evaluated for injuries received in a motor vehicle collision and that the caregiver had not found his injuries serious enough to require hospitalization. ECF No. 148 at 1. The custom instructions from the physician assistant indicated that Williams could take Tylenol or Ibuprofen as needed for pain, recommended gentle stretching and local massage for pain areas, and advised Williams that he should expect to feel more stiff and sore the following day. *Id.* The instructions advised Williams to return if his conditions worsened or he had any emergencies. *Id.* They also mentioned examples of situations in which a patient should seek immediate medical care, such as "numbness, tingling, weakness, or problem with the use of your arms or legs." *Id.* at 2.

Bergum does not recall having any contact with Williams during the medical evaluation. Instead, he went to his cruiser, at the request of his sergeant, to immediately complete a synopsis of the incident. Bergum then drove to the Racine County Jail to complete booking. Bergum's only contact with Williams at the Jail occurred after the Racine County deputies transported Williams to the Jail. Bergum approached Williams at his cell and attempted to read Williams his Miranda rights

and obtain information from him. At the time, Williams appeared to be sleeping did not respond to several attempts to wake him. *Id.*, ¶¶ 24–28, 36.

Williams maintains that Bergum signed his hospital discharge papers, but he does not cite to any documents to support his assertion. In fact, the hospital records Williams produced do not bear Bergum's signature. ECF No. 103, Ex. 1; ECF No. 95-1 at 5-7, ECF No. 148 at 1-2. Williams also avers that Bergum followed the ambulance to the hospital, was at the hospital, did not allow Williams to see a doctor, ignored the doctor's orders that Williams could not walk, dragged Williams down the hospital corridor by twisting his thumbs and arms, and deliberately hit Williams' head on the side of the car. ECF No. 112, ¶¶ 8–12. Seemingly contradicting himself, Williams' declaration and his unsworn responses to Bergum's proposed findings of fact also mention going in and out of consciousness. His responses attempt to assign specific action or inaction to Bergum during the time he was unconscious or asleep, though he could not know who was acting. *Id.*, ¶¶ 13–14; ECF No. 127, ¶ 21. Williams further submits that Bergum left medical complaints out of the booking report, deliberately concealed Williams' hospital discharge papers, and told Jail staff that Williams was combative so they could harm him. ECF No. 112, ¶¶ 17–20; ECF No. 128, ¶¶ 18–20.

## C. Racine County Jail - Intake[2]

Williams was booked into the Racine County Jail on May 8, 2013. The typical admission and booking process at the Jail includes a custodial search, personal information update, health screening, alcohol breath test, property inventory, finger printing, mug shots, vending account and phone set

---

[2] Williams' response to the Racine County Defendants' proposed findings of fact was not sworn and did not cite to admissible evidence. ECF No. 104. However, Williams submitted a sworn declaration with 124 assertions of fact, and the defendants responded to those assertions. ECF Nos. 105, 122.

up, and computer entry of charges. Inmates who are uncooperative or highly impaired upon intake may be placed into a segregated holding cell until they are willing and able to complete the booking process. Williams acknowledges that he refused to take intake processing photos and finger prints. He claims he refused to cooperate because defendant Carrie Ballew would not bring him a wheelchair or medication, though he states he sat in a wheelchair during the booking process. Williams asserts Ballew ignored his requests for medical attention. As a result, he did not receive any medication from the time he remained in the segregated holding cell beginning May 8, 2013, until he moved to Cell 2DC09-1L on May 12, 2013. ECF No. 84, ¶¶ 8–11, 27; ECF No. 104, ¶ 10; ECF No. 122, ¶¶ 14–15.

Williams claims he told jail staff that he had a cane and walker in his car as well as a left knee sleeve and a right knee brace. He also reported a head injury from the car accident. He asserts that jail staff watched him pull himself along the floor like a lizard for months. However, Williams signed a Medical Screening form on May 10, 2013, indicating that he did not have a recent head injury or any physical limitations or restrictions on his mobility that would require immediate accommodations. ECF No. 95-1 at 1–5.

In his deposition, Williams testified that he was knocked out for three or four days after his arrest, noting he was "out cold" and remembers "nothing." ECF No. 123-1; 10:12–18. He indicated he was finally processed three or four days after the accident when he was conscious, but he testified that he could not remember if Officer Ballew was present when he was processed. ECF No. 123-1; 13:16–25.

**D. Medical Treatment at the Jail**

A nurse examined Williams on the day he arrived at the Jail. Williams complained of left shoulder and chest pain and self-reported a history of hypertension. The nurse noted Williams was

- 8 -

able to move his left arm, recorded his blood pressure, and verified his medications. She also noted Williams would not look directly at her when he answered questions about substance abuse. Dr. Ortiz signed off on the May 8, 2013 medical progress note the following day. ECF No. 84, ¶¶ 12–16. According to Williams' medical file, he began receiving a number of medications on May 8, 2013 and continued to receive daily medication for the remainder of the month. *Id.* ¶¶ 17–19.

Jail staff conducted a medical screening as part of the intake process on May 10, 2013. There is no indication that any of the defendants were involved in the screening. Williams was conscious and had no visible signs of trauma or illness that required immediate emergency or physician involvement. The screening indicates that Williams had no physical limitations or restricted mobility that would require immediate attention. There is no indication that Williams asked for a wheelchair or knee braces, and he did not report a recent head injury, blackout, or fainting spells.

Williams asserts that defendant Patrick Noonan placed Williams in segregation on May 15, 2013, after Williams' visit with his criminal defense attorney. Williams claims that, during the visit, his attorney was irate that Williams was bloody, dirty, and in distress. After Noonan placed Williams in segregation, he indicated he would get Williams medical attention, though he did not. Williams also claims Noonan stated he would have to remain in segregation if he wanted to use medical orthopedic devices. He asserts defendant Sergeant Melissa Gonzalez conspired with Noonan to deny Williams access to the medical pod. ECF No. 103 at 20.

On May 20, 2013, medical staff evaluated Williams after he complained he could not stand or walk. The assessment noted no acute abnormalities. In addition, Williams' inmate file contains several entries recorded in the first month of Williams' arrival at the Jail documenting staff members observing Williams stand and/or walk without assistance.

Williams submitted his first request for medical attention on May 25, 2013, asking for C-Cream to treat dry skin and sores on his hands, arms, and legs. On May 31, 2013, Williams requested an extra mattress and pain pills for pain in his back, leg, and hip. ECF No. 84, ¶¶ 37–38. Medical staff assessed Williams on June 3, 2013 and approved 650 mg of Tylenol twice a day for fourteen days. *Id.* at ¶ 39. On June 18, 2013, Williams submitted another request, complaining that Tylenol was not effective and that he needed "some sort of plastic knee brace" and a "wrist bandage." Medical staff addressed the request the same day by increasing Williams' Tylenol dosage to 1,000 mg and instructed Williams to take it twice a day for an additional thirty days. *Id.* at ¶¶ 41–44. Williams submitted another request on June 27, 2013, again complaining that the Tylenol was not relieving his pain. Medical staff instructed Williams to take 600 mg of Ibuprofen twice a day for thirty days, beginning on the evening of June 29, 2013. *Id.* at ¶¶ 45–46. Williams submitted three inmate requests for medical attention during July 2013, relating to skin cream, which was promptly delivered, and eye medication, which he was allowed to keep at the end of the month. *Id.* at ¶¶ 47–51.

Medical staff observed Williams twice a day during medication distribution in the months of June and July 2013, with the exception of the days in which Williams spent in the Kenosha County Jail in connection with charges pending in that County. While medical staff allowed Williams to use a wheelchair for transport to the Kenosha County Jail on July 29, 2013, there is no note from a medical doctor or other medical staff indicating that a wheelchair was a medical necessity or that Williams should continue to use it after his return from the Kenosha County Jail. *Id.* at ¶¶ 52–54. Williams did not request a knee brace again until September 30, 2013, though he submitted at least nine requests for medical attention in the interim on unrelated issues and was assessed by medical

staff at least six times. *Id.* at ¶¶ 57–59. A physician examined Williams on October 3, 2013, after receiving his knee brace request. The physician did not prescribe a wheelchair, brace, or extra mattress as medically necessary. Williams continued to submit requests regarding itchy skin and dry eyes, and medical staff responded to his requests within one or two days. *Id.* at ¶¶ 64–69.

In December 2013, Williams was moved to segregation and placed on disciplinary lockdown after he was found guilty of fighting with another inmate. Jail policy requires jail staff to remove mattresses from the cells of those inmates in disciplinary lockdown during the hours of 8:00 a.m. to 8:00 p.m., unless medical staff deem it medically necessary for an inmate to have continuous access to his mattress. Williams submitted an inmate request for medical attention related to his mattress on December 27, 2013. On December 30, 2013, an unknown medical staff member allowed Williams to keep his mattress during all hours of the day. However, the medical staff member did not indicate in Williams' medical file that it was medically necessary for him to keep a mattress. As a result, the decision was rescinded the following day. *Id.* ¶¶ 71–77.

During Williams' time at the Jail in 2014, he submitted at least 112 inmate requests for medical attention. Several of the requests sought permission to use his mattress between the hours of 8:00 a.m. and 8:00 p.m. while in disciplinary segregation or the use of an extra mattress. There is no documentation in Williams' medical file indicating that he should have an extra mattress, and his requests were denied by medical staff. Medical staff advised Lieutenant Friend in particular that it was not medically necessary for Williams to use an extra mattress and that his requests were not approved. Three of Williams' requests related to wheelchair use, and two requested knee braces. Each of these requests was addressed by medical staff, and they continued to assess him regularly. *Id.* ¶¶ 79–87.

Williams submits that Nurse Patton would override orders from Dr. Ortiz for anything concerning his treatment. He also claims he always requested a wheelchair and knee braces and made daily verbal requests for mattresses, knee braces, and a cane. Williams asserts he lodged many complaints regarding his medical treatment with Lieutenant Friend and Captain Wearing, but they would not investigate his concerns. Ultimately, Williams asserts his Jail medical chart contains many false entries and that "All RCJ medical chart on the Plaintiff are false." ECF No. 122 at ¶ 72.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "[A] factual dispute is 'genuine' for summary judgment purposes only when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that

party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

The defendants have filed three separate motions for summary judgment. I will address each motion individually after setting forth the law applicable to Williams' claims. A number of Williams' claims must be analyzed under the Fourth Amendment's objectively unreasoanble standard, rather than Fourteenth Amendment's Due Process Clause. Claims of a pretrial detainee who has not yet had a judicial determination of probable cause are governed by the Fourth Amendment. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007) (citing *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006)). A court must consider four factors in analyzing an inmate's claims of inadequate medical care under the Fourth Amendment: (1) whether the officer had notice of the arrestee's medical need, either through words or observation; (2) the seriousness of the medical need, including whether complaints are accompanied by any physical symptoms; (3) the scope of the requested treatment, which is to be balanced against the seriousness of the medical need; and (4) police interests. *Id.* (citing *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007)).

The remainder of Williams' claims, which arose when he was a pretrial detainee, will be analyzed under the Due Process Clause of the Fourteenth Amendment. *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (citing *Rice ex rel. Corr. Med Servs.*, 675 F.3d 650, 664 (7th Cir. 2012)). A pretrial detainee is "entitled to at least the same protection against deliberate indifference to his basic needs as is available to convicted prisoners under the Eighth Amendment." *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). Therefore, the court applies the same legal standards to claims brought under either the Eighth or Fourteenth Amendments. *Minix v. Canarecci*, 597 F.3d

824, 831 (7th Cir. 2010). The Eighth Amendment prohibits "cruel and unusual punishments" and imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An inmate's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that claim." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). The defendants do not dispute that Williams had an objectively serious medical condition. Therefore, Williams must demonstrate that the defendants were deliberately indifferent to his medical needs.

Deliberate indifference requires more than negligence or even gross negligence. It requires that the defendants knew of, yet disregarded, an excessive risk to Williams' health or safety. *Farmer*, 511 U.S. at 835; *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "A state officer is deliberately indifferent when he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) (internal citations omitted).

**A. Bergum**

Williams asserts Bergum failed to appropriately respond to his medical needs by ignoring his doctor's statements that Williams could not walk and dragging him from the hospital to the police car. In addition, Williams argues that Bergum failed to ensure Williams received proper medical care at the jail, because Bergum did not inform jail staff that Williams was unable to walk or was in a car accident. Bergum contends he is entitled to summary judgment because he had no involvement in the alleged deprivation of Williams' constitutional rights. In particular, Bergum maintains that he

did not transport Williams to the hospital, was not present with Williams at the hospital, did not transport Williams from the hospital to the Racine County Jail, and was not present at the time Williams was processed into the Jail.

Although Williams attempts to create a genuine dispute of material fact regarding Bergum's personal involvement by insisting Bergum was in the ambulance with him and at the hospital, he cannot overcome the conclusion that the medical treatment he received, from his arrest through the booking at the Jail, was objectively reasonable. *See Sides*, 496 F.3d at 828. Bergum called for an ambulance after Williams complained of injuries he sustained when the car he was driving was forcibly stopped. The ambulance transported Williams to the hospital, where he was evaluated by medical professionals who concluded Williams' injuries only required over the counter pain relievers, gentle stretching, and massage. To the extent Bergum was aware of Williams' medical needs, he acted reasonably in responding to them. Bergum knew that hospital staff treated Williams and subsequently released him from the hospital, that Williams did not require narcotic pain medication to manage any pain related to the injuries, and that Jail medical staff would evaluate Williams and provide him medications as part of the booking process. Bergum's actions did not violate the Constitution.

Finally, Williams asserts that the tactics used to end the high-speed chase violated his constitutional rights. Yet, those arguments are outside the scope of his claims against Bergum in this case and will not be considered by the court. Accordingly, Bergum's motion for summary judgment will be granted.

**B. Racine County Jail Defendants**

Williams argues that various Racine County Jail officers ignored his complaints concerning his medical needs. His complaints regarding his medical treatment begin when he was first booked

into the Racine County Jail on May 8, 2013. Williams claims that during intake, Ballew ignored his continued requests for medical care, a wheelchair, knee braces, and medication. These allegations, however, are contradicted by Williams' deposition testimony that he was unconscious for the first several days he was at the Jail and that he does not remember if Ballew was present during the time he finally completed the intake process. They can be rejected for that reason alone. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n.5 (7th Cir. 2008) ("It is well established in this Circuit that, as a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of . . . the unmistakable need to clarify prior ambiguous statements." (citations omitted)).

Even if the court were to consider Williams' claims, the court finds that Ballew's response to Williams' medical needs was objectively reasonable.[3] Ballew did not interfere with or prevent Williams from receiving medical care during booking. Williams' concerns were addressed by medical staff during the medical screening phase of his processing. Indeed, Williams was examined by medical staff on May 8, 2013 upon his arrival at the jail. Ballew was justified in relying on the Jail's medical staff to address Williams' medical complaints. *See McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2012); *Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011) ("Non-medical defendants . . . can rely on the expertise of medical personnel."). Because Williams has failed to provide any support for his claim that Ballew denied him access to medical care, summary judgment will be granted in Ballew's favor.

---

[3] Although the defendants analyze whether they were deliberately indifferent to Williams' medical needs under the Fourteenth and Eight Amendments, the Fourth Amendment applies to his claims against Ballew, because the events giving rise to those claims likely occurred prior to a judicial determination of probable cause. *Williams*, 509 F.3d at 403.

To the extent Williams asserts that the remaining defendants were deliberately indifferent in denying or ignoring his requests to receive medical care, a wheelchair, leg braces, or an extra mattress, his claims fail. The defendants were aware that the medical staff concluded Williams' requests for wheelchair use, a special mattress accommodation, and knee braces were not medical necessities. As security staff members, these defendants are allowed to rely on the judgment of medical professionals regarding an inmate's medical needs and the appropriateness and efficacy of his treatment. *See Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) ("A layperson's failure to tell the medical staff how to do its job cannot be deliberate indifference; it is just a form of failing to provide a gratuitous rescue service."); *Bond v. Aguinaldo*, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002) ("Except in the unusual case where it would be evident to a lay person that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals."). Williams had direct contact with the medical professionals regularly, and he had the ability to write to them and did notify them about any concerns or complaints. The security staff did not have reason to second-guess the decisions made by medical staff regarding Williams' treatment. I will therefore grant the Racine County defendants' motion for summary judgment.

**C. Medical Defendants**

Williams alleges Nurses Patton and Martinez were deliberately indifferent to his serious medical needs. He asserts these defendants violated his constitutional rights by failing to provide him with the following: eye drops, access to a wheelchair, pain medication, a double mattress, knee braces, foot cream, and a cotton blanket. Williams' claims against the medical defendants amount to disagreements with the treatment he received at the Jail. Though Williams may disagree with the

type of treatment he received, mere disagreement with the medical staff's chosen course of treatment does not amount to deliberate indifference under the Eighth Amendment. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). In addition, Nurse Patton and Nurse Martinez are registered nurses who do not have the authority to change the course of Williams' medical treatment at the Jail. Williams has not demonstrated that the medical staff's treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision" on his or her medical judgment. *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (citation omitted).

The medical records indicate that Williams was repeatedly treated by medical professionals for his various complaints and addressed his concerns. Though medical staff concluded a wheelchair, knee braces, and mattress accommodation were not medical necessities, they continued to monitor and examine Williams' requests for treatment of his neck, back, and leg pain. In addition, Williams' pain prescriptions were modified may times to treat the level of pain he claimed, his eye condition was treated appropriately with artificial tears and antibiotics, and his dry skin was successfully treated by skin cream. While Williams claims his medical records are inaccurate, the court simply cannot countenance his general denial that all of his medical records are false. He does not provide specific instances of errors or demonstrate that the medical defendants' decisions were such a substantial departure from accepted professional standards. It also seems that Williams' general denial contradicts many of his specific assertions regarding his medical treatment at the Jail. In sum, the medical defendants' motion for summary judgment will be granted.

## CONCLUSION

Although the court must take the facts in the light most favorable to Williams, his conclusory denials of the defendants' facts as well as his own conclusory allegations are insufficient to establish

a dispute of material fact to warrant the denial of the defendants' motions for summary judgment. His allegations that the defendants and, indeed, the entire Jail administration and medical staff conspired to violate his constitutional rights or falsify his medical records are implausible. It would be unfair and unjust to require the defendants to expend additional time and financial resources defending against Williams' claims based on these vague, conclusory, and utterly implausible accusations.

For the foregoing reasons, the Racine County defendants' motion for summary judgment, Derek Bergum's motion for summary judgment, and the medical defendants' motion for summary judgment (ECF Nos. 82, 88, 92) are **GRANTED**. Williams' claims against defendants Nurse Tom, Nurse Practitioner Jane Doe, and Trooper John Doe are **DISMISSED WITH PREJUDICE**. Williams' motion to appoint counsel (ECF No. 163) is **DENIED**. The Clerk is directed to enter judgment accordingly.

Dated at Green Bay, Wisconsin this 9th day of January, 2018.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court - WIED